UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

BAREFIELD WORKPLACE
SOLUTIONS, INC.                                                                    PLAINTIFF

v.                                                    CIVIL ACTION NO. 3:17-CV-87-KHJ-LGI

MILLER'S OF COLUMBIA, INC.;
ET AL.                                                                             DEFENDANTS

ORDER

This action is before the Court on Defendants Shirisha Janumpally, Silvija

Valleru, Lionshead Enterprises, Corp., Suresh Venkat Doki, and Suresh Boyapati's

Motion for Summary Judgment [195]. For these reasons, the Court grants in part

and denies in part Defendants' motion.

I.      Facts and Procedural History

Barefield Workplace Solutions, Inc. ("Barefield") is a Mississippi-based

furniture supply company that mainly provides office, healthcare, and education

furniture. [199-1] at 14:22-25. This lawsuit arises from a contract between Barefield

and Miller's of Columbia, Inc. ("Miller's") under which Barefield agreed to purchase

and install furniture at the Bureau of Land Management ("BLM") office in Flowood,

Mississippi. Because Barefield did not qualify directly for the government contract

with BLM, but Miller's did, Barefield agreed to buy the furniture from Kimball

Furniture Company; install the furniture at BLM; and submit all invoices to

Miller's for payment. *Id.* at 21:1-18. The government would issue payment to

Miller's, who would in turn reimburse Barefield for the furniture orders.

When Barefield and Miller's entered this agreement, Paul and David Olsen owned Miller's. [118] at 4. In February 2016, though, Defendants Janumpally and Valleru acquired 70% of Miller's voting shares and assumed majority control of the company. *See* [199-2]. Janumpally became Miller's Chief Executive Officer and a Director; Valleru became the President, Treasurer, and a Director; and Paul Olsen became the Chief Operating Officer. *Id.* Janumpally and Valleru appointed Lionshead Enterprises Corp. ("Lionshead")—a "holding company" owned by Janumpally's husband—to manage Miller's. [199-3] at 28:16-23.

When Miller's changed ownership, Paul Maczka, Barefield's Chief Operating Officer, became concerned about the "financial logistics of the contract" between Barefield and Miller's. [199] at 4. He expressed his concerns to Paul Olsen (still a Miller's officer, but no longer an owner), and on June 22, 2016, Olsen offered to set up a conference call between Maczka and the "new owner's representative" to address his financial concerns. [199-4] at 1. The call took place two days later between Olsen, Maczka, and Defendant Suresh Doki, a consultant for Lionshead and Janumpully's brother-in-law. [199-5], ¶¶ 4, 6. Maczka asked that they "redirect the [government's] payment" so that it could "come directly to [Barefield]" without having to pass through Miller's. [199-1] at 63:9-16. Doki declined, explaining that because Miller's had issued the purchase order on June 16, 2016, "with [Miller's] as the direct receivable," he could not change the payment instructions. *Id.*; [199] at 4; *see also* [3-1] (Miller's purchase order to Barefield). As a compromise, according to Maczka and Paul Olsen, Doki promised to "direct [the BLM funds] to an escrow

account" once Miller's received them and to hold them for Barefield's benefit. [199-1] at 95:23-96:24; [199-5], ¶ 6. Defendants admit "there was no agreement or intent that any funds be held in escrow." Answer [135], ¶ 29; *see also* Doki's 30(b)(6) deposition for Lionshead, [195-1] at 128:13-25 ("I don't remember having any conversations about an escrow promise. . . If an escrow promise was made, why did people not follow up and do an escrow agreement . . . I've been told numerous times . . . I made the commitment that I would do that. I don't remember that.").

Barefield says it relied on Doki's promise to hold the funds in escrow to "continue with the project after discovering that Janumpally and Valleru were Miller's new owners." [199] at 7. Specifically, Barefield says it placed a furniture order with Kimball and paid Kimball for the cost of the furniture following the conversation with Doki and Olsen. [199] at 5. Once it received and installed the furniture at the BLM building, Barefield submitted two invoices to Miller's for a total amount of $346,923.41. [196] at 5. But when the government sent Miller's its $357,810.65 payment for the BLM project, Miller's neither paid Barefield nor placed Barefield's funds in escrow for its benefit. *Id.*; [199] at 5. Instead, when a Miller's employee informed Paul Olsen and Lionshead employee/Director[1] Suresh Boyapati that Miller's received the money and that this money was "to be used to pay Barefield[,]" Boyapati responded: "Let's hold the payment to them, and let it cover the payroll, pay the essential bills and National to release on-hold orders." [199-6]. Doki agreed, stating he "just spoke to the owners" (Janumpally and Valleru), and

---

[1] Parties dispute Boyapati's title, *see* [199] at 14 n. 2; [201]. ¶¶ 6-7.

"they want to hold the money until we speak . . . to their attorneys and decide the path of least litigation." Doki further stated, " . . . **DO NOT MAKE ANY PAYMENTS UNTIL WE HEAR BACK FROM OUR ATTORNEY LATER TODAY. If there is a risk of payments leaving the account automatically, I would require the money to be moved to Lionshead account temporarily.**" *Id.* (emphasis in original).[2] The same day, Doki instructed Boyapati, who approved Miller's bank transfers, to transfer $320,000 from the Miller's account to a Lionshead account, and Boyapati complied. [195-2] at 74:1-4. Barefield never received any money for purchasing and installing the furniture in the BLM building. [196] at 2.

Feeling aggrieved, Barefield sued Miller's, David and Paul Olsen, Janumpally, Valleru, Lionshead, Doki, and Boyapati for conversion; civil conspiracy; breach of the duty of good faith and fair dealing; and unjust enrichment. [95]. Barefield also sued Miller's, David and Paul Olsen, Janumpally, Valleru, Lionshead, and Doki for breach of fiduciary duty arising from the escrow agreement; breach of fiduciary duty regarding Miller's insolvency; and fraud. *Id.* Miller's originally answered the Complaint but later withdrew this Answer and asked the Clerk of Court to enter default judgment against it. [162]. Barefield voluntarily dismissed its claims against David and Paul Olsen. [95]; [153]. Defendants Janumpally, Valleru, Lionshead, Doki, and Boyapati move for summary judgment on all claims against them.

---

[2] Doki says he did not discuss this transfer with Janumpally and Valleru. [195-1] at 127:2-6 ("Q: With regard to the $320,000 transfer . . . did you have any discussions before that transfer with Janumpally and Valleru about it? A: No, no.")

4

II.     Standard

In reviewing a motion for summary judgment, the Court must determine
whether there is a "genuine dispute as to any material fact" and whether "the
movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court
views the evidence and draws reasonable inferences in the light most favorable to
the nonmovant. *Duval v. N. Assur. Co. of Am.*, 722 F.3d 300, 303 (5th Cir. 2013). "A
fact issue is 'material' if its resolution could affect the outcome of the action." *Levy
Gardens Partners 2007, L.P. v. Commonwealth Land Title Ins. Co.*, 706 F.3d 622,
628 (5th Cir. 2013) (citation omitted). A dispute is genuine "if the evidence is such
that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.
Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment need only show "an absence of
evidentiary support in the record" for any issue that the non-movant must prove at
trial. *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010) (citation omitted).
Once the movant meets this requirement, "the burden shifts to the non-movant to
produce evidence of the existence of such an issue for trial." *Id.* (citation omitted).
The non-movant may rely on depositions, affidavits, or declaration, or other
materials to show a genuine issue of fact, Fed. R. Civ. P. 56(c), and must present
more than "speculation, improbable inferences, or unsubstantiated assertions."
*Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019) (quoting *Lawrence v. Fed.
Home Loan Mortg. Corp.*, 808 F.3d 670, 673 (5th Cir. 2015)). "A failure on the part
of the nonmoving party to offer proof concerning an essential element of its case

necessarily renders all other facts immaterial and mandates a finding that no genuine issue of fact exists." *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006) (citing *Saunders v. Michelin Tire Corp.*, 942 F.2d 299, 301 (5th Cir. 1991)).

III.   Analysis

Defendants Janumpally, Valleru, Lionshead, Doki, and Boyapati move for summary judgment on these claims: conversion; civil conspiracy; and unjust enrichment.[3] Janumpally Valleru, Lionshead, and Doki also move for summary judgment on these claims: breach of fiduciary duty arising from the escrow agreement; breach of fiduciary duty arising from Miller's insolvency; fraud. The Court addresses first the claims against all Defendants and then addresses the claims against Janumpally Valleru, Lionshead, and Doki.

A.  Claims Against All Defendants

1.  Conversion and Unjust Enrichment

Defendants ask the Court to grant summary judgment on Barefield's claims of conversion and unjust enrichment. First, Defendants argue they are not liable for conversion because Barefield did not have a legal right to possession of the funds. Next, they contend they are not liable for unjust enrichment because none of the individual Defendants possessed the BLM funds in their individual capacities. Barefield responds that it has a legal right to possession of the BLM funds under the agreement between Miller's and Barefield, and Doki's later promise to hold

---

[3] Barefield voluntarily dismisses its allegations of bad faith and unfair dealings as to all Defendants. [199] at 19.

these funds in escrow in exchange for Barefield ordering and installing the furniture from Kimball's. Even if no legal right exists, Barefield argues, the transfer unjustly enriched the Defendants.

As there are multiple moving Defendants, the Court first examines whether individuals may be personally liable for conversion committed as the officer, director, or agent of a corporation. "[A]ny officer or agent of a corporation who actively participates in the commission of a tort [conversion] is personally liable to third persons injured thereby." *Wilson v. S. Cent. Miss. Farmers, Inc.*, 494 So. 2d 358, 361 (Miss. 1986) (alteration in original); *see also* 19 C.J.S. *Corporations* § 630 ("[C]orporate directors, officers, or agents are personally liable for the torts they commit, including negligence and intentional torts, regardless of whether they acted on their own account or on behalf of the corporation. . . . Imposing personal liability on these terms does not require piercing the corporate veil.").

Under this standard, Barefield must only show that Janumpally, Valleru, Doki, Lionshead, and Boyapati

> participated in the tortious act, or has authorized or directed it, or has acted in [their] own behalf, or has had any knowledge of, or given any consent to, the act or transaction, or has acquiesced in it when he either knew or by the exercise of reasonable care should have known of it and should have objected and taken steps to prevent it.

*Turner v. Wilson*, 620 So. 2d 545, 548-49 (Miss. 1993). The tortious act that Barefield alleges here is the transfer of $320,000 from Miller's to Lionshead on the same day BLM paid Miller's. The Court must therefore consider whether each individual Defendant actively participated in the alleged conversion.

7

Barefield has presented sufficient evidence to create a genuine issue as to whether Janumpally, Valleru, Lionshead, Doki, and Boyapati actively participated in the potential conversion. Parties do not dispute that Miller's agreed to pay Barefield for the purchase and installation of furniture in the BLM building. Although Paul and David Olsen owned Miller's when Barefield agreed to buy and install the furniture, Janumpally, Valleru, Lionshead, Doki, and Boyapati each knew, or should have known, about the agreement. Yet when BLM paid Miller's for this work, these Defendants authorized, consented, participated in, or acquiesced in the transferring this money to Lionshead to for another use. Although Boyapati was only an employee of Lionshead at the time of the transfer, there is sufficient evidence to create a genuine issue as to whether he acted as Lionshead's agent in transferring the BLM funds, as he admits that Doki directed Boyapati to make the transfer and the bank needed Boyapati's approval. *See generally Cooley v. Brawner*, 881 So. 2d 300, 302 (Miss. Ct. App. 2004) ("The question of whether or not a person has apparent authority is a factual issue to be decided by . . . the jury"). Each party may therefore be liable for conversion if Barefield has a legal right to possession of the BLM funds.

As for Barefield's unjust enrichment claim, the Court finds genuine issues of fact exist as to whether each individual Defendant received a monetary benefit from the BLM funds. Unjust enrichment is an equitable remedy that the Court applies when "no legal contract exists, and the person charged is in possession of money or property which, in good conscience and justice, he or she should not be permitted to

retain." *Willis v. Rehab Sols., PLLC*, 82 So. 3d 583, 588 (Miss. 2012). Barefield presents evidence Lionshead used these funds to pay off loans in other businesses, at least one of which Janumpally owns. Barefield also presents evidence Lionshead may have used these funds to pay Valleru's lawyers (representing her in an unrelated action involving another company) and Doki's travel. There is also some evidence Lionshead paid Boyapati and Doki directly after the BLM transfer, despite their insistence Lionshead did not pay them. These facts create a genuine issue as to whether Defendants were unjustly enriched in their personal capacities, especially when viewed in the light most favorable to Barefield. For these reasons, each party may be liable for unjust enrichment if Barefield has an equitable right to the BLM funds.

In any event, summary judgment is not proper on either claim because there are genuine issues of fact about whether Doki promised to hold the BLM funds in escrow for Barefield and whether this promise was part of a contract between Miller's, Lionshead, and Barefield. *See generally Crow v. Crow Sports Ctr., Inc.*, 119 So. 3d 352, 356 (Miss. Ct. App. 2012) (providing that "[t]he existence of a contract is a question of fact that is to be determined by a jury"). The existence of a contract is material because it decides which theory of liability applies. *Compare Cmty. Bank, Ellisville, Miss. v. Courtney*, 884 So. 2d 767, 772-73 (Miss. 2004) (defining conversion as wrongfully possessing or detaining property over which someone else has a legal right even though the owner has demanded the return of the property), *with Willis*, 82 So. 3d at 588 (citation omitted) (defining unjust enrichment as

existing only when "no legal contract exists, and the person charged is in possession of money or property which, in good conscience and justice, he or she should not be permitted to retain"). The Court therefore denies summary judgment for conversion and unjust enrichment as to all Defendants.

      2.  Civil Conspiracy

Barefield alleges Defendants conspired together to convert the BLM funds for use in their other businesses. Defendants argue they cannot be liable for civil conspiracy because they acted as agents of Lionshead and Miller's and because no evidence shows that they acted in concert. To establish civil conspiracy, a party must show "(1) an agreement existed between two or more persons, (2) to accomplish an unlawful purpose or a lawful purpose unlawfully, (3) an overt act in furtherance of the conspiracy, and (4) damages to the plaintiff as a proximate result." *Bradley v. Kelley Bros. Contractors, Inc.*, 117 So. 3d 331, 339 (Miss. Ct. App. 2013). While individuals acting within their employment capacities cannot conspire with their corporate employer because "acts of agents are the acts of the corporation," two separate corporations can conspire together. *Blades v. Countrywide Home Loans, Inc.*, No. 1:06-CV-1000-LG-JMR, 2007 WL 2746678, at *3 (S.D. Miss. Sept. 18, 2007) (holding that two separate corporate entities could enter a civil conspiracy); *but see Frye v. Am. Gen. Fin., Inc.*, 307 F. Supp. 2d 836, 844 (S.D. Miss. 2004) (loan officers could not conspire with loan company when they did not act outside their employment); *Wesley Health Sys., LLC v. Forrest Cty. Bd. of Sup'rs*, 2014 WL 232109, at *12 (S.D. Miss. Jan. 22, 2014) (subsidiary could not

conspire with parent company).

The Court agrees the acts of Janumpully and Valleru were acts of Miller's and the acts of Doki and Boyapati were acts of Lionshead, as there are no allegations that any of these individuals acted outside of their representative capacities. The Court therefore grants summary judgment on this claim as to Janumpally, Valleru, Doki, and Boyapati. The Court denies summary judgment, however, as to Lionshead because there is a genuine issue as to whether Lionshead and Miller's conspired through their agents to convert the BLM funds for their own purposes rather than pay Barefield.

B.  Claims Against Janumpally Valleru, Lionshead, and Doki

1.  Breach of Fiduciary Duty

Barefield alleges two fiduciary relationships existed between it and Janumpally, Valleru, Doki, and Lionshead—one created when Doki promised to hold the BLM funds in escrow while acting in his capacity as a Lionshead employee for Janumpally and Valleru; and another created by virtue of Janumpally and Valleru's statuses as officers of Miller's and their delegation of management authority to Doki and Lionshead. When these Defendants did not hold the BLM funds in escrow, Barefield argues, they breached the first fiduciary relationship. Defendants breached the second fiduciary relationship, Barefield contends, when they engaged in "self-dealing transfers of capital out of Miller's" at a time when Miller's was insolvent—thereby shifting the fiduciary duty of care and loyalty owed to Miller's shareholders to its creditors: Barefield. Defendants ask the Court to

grant them summary judgment on this claim because: (1) any agreement to hold the funds in escrow is unenforceable for lack of new consideration; and (2) even if an oral escrow agreement existed, Defendants did not individually owe fiduciary duties to Barefield under such agreement. [196] at 8-13.

To establish a breach of fiduciary duty, a party must establish "(1) a fiduciary relationship, and (2) its breach." *Peters v. Metro. Life Ins. Co.*, 164 F. Supp. 2d 830, 835 (S.D. Miss. 2001) (citing Restatement (Second) of Torts § 874 and cmt. b (Am. Law Inst. 1975)). "The determination of what constitutes a confidential or fiduciary relationship is a question of fact." *Lowery v. Guar. Bank & Trust Co.*, 592 So. 2d 79, 85 (Miss. 1991). This general principle, however, only applies in relationships where Mississippi courts have found a fiduciary relationship to sometimes exist and sometimes not exist. *Guthrie v. J.C. Penney Co., Inc.*, 803 F.2d 202, 211 (5th Cir. 1986). Relevant here, Mississippi courts have found fiduciary relationships between parties in a commercial transaction when "(1) the parties have shared goals in each other's commercial activities, (2) one of the parties places justifiable confidence or trust in the other party's fidelity, and (3) the trusted party exercises effective control over the other party." *AmSouth v. Gupta*, 838 So. 2d 205, 216 (Miss. 2002); *see also Robley v. Blue Cross/Blue Shield of Miss.*, 935 So. 2d 990, 994-95 (Miss. 2006) (finding a fiduciary relationship may exist where there is "justifiable special trust and confidence in the parties so that the first party relaxes the care and vigilance normally exercised in entering into a transaction with a stranger"). Because the existence of a fiduciary duty between two transacting parties is a fact-

based determination, it is a jury question. *Lowery*, 592 So. 2d at 85.

Mississippi courts have consistently held that directors and officers owe a duty of good faith and loyalty in discharge of the corporate office, which shifts to the corporation's creditors when the corporation is insolvent. *Stanley v. Miss. State Pilots of Gulfport, Inc.*, 951 So. 2d 535, 540-41 (Miss. 2006). The existence of these corporate fiduciary duties is therefore not a jury question, but the breach of a fiduciary duty remains a question of fact. *See, e.g.*, *Geisenberger v. John Hancock Distribs., Inc.*, 774 F. Supp. 1045, 1052 (S.D. Miss. 1991) (denying summary judgment when there was a genuine issue as to whether defendants complied with their fiduciary duty). As Barefield alleges distinct fiduciary duties, the Court will analyze these claims separately.

a.   Escrow Agreement

Barefield alleges Defendants had a fiduciary duty to hold the BLM funds in escrow. Parties first disagree over whether Doki's alleged promise to hold the BLM funds in escrow for Barefield constituted terms of the original agreement or a modified contract between Miller's and Barefield. This Court, however, need not decide this issue now. Barefield has presented sufficient evidence to create a genuine issue on whether Doki's alleged promise was part of the agreement between Miller's and Barefield. When Barefield originally contracted with Miller's, Lionshead did not manage Miller's accounts. Only after learning of this new corporate arrangement did Barefield CEO Maczka ask to speak with the new owners about the payment arrangements. When Maczka learned that the payment

instructions for the BLM project could not change, he sought another type of assurance that Miller's would pay Barefield. Olsen, Maczka, and Doki participated in a conference call, during which Doki allegedly promised Maczka he would hold the funds in escrow for Barefield's benefit. Relying on this promise, Maczka ordered and installed furniture from Kimball's in the BLM building. The Court finds these facts create a genuine issue as to whether Doki's alleged promise was part of the agreement between Miller's and Barefield. *Crow,* 119 So. 3d at 356.

Even if a contract exists, this does not necessarily create a fiduciary duty. When parties are merely engaged in an arm's-length business transaction where each acts only for their own benefit, Mississippi courts have refused to recognize a fiduciary relationship. *Robley*, 935 So. 2d at 995. "[W]here the contractual relationship creates a justifiable special trust and confidence in the parties so that the first party relaxes the care and vigilance normally exercised in entering into a transaction with a stranger," however, a fiduciary relationship may exist. *Id.* (citing *Lowery*, 592 So. 2d at 83). Defendants argue Miller's agreement with Barefield was merely an arm's-length transaction, and therefore, no fiduciary duty exists. Barefield states that Doki's promise to act for Barefield's benefit by holding the BLM funds in escrow created justifiable trust and confidence that Miller's, through Lionshead, would pay Barefield. And Barefield contends that Doki made this promise in response to Maczka's concerns over payment and that Barefield only placed its order with Kimball's in reliance on this promise. The Court finds that these facts are enough to show that this was not merely an arm's-length transaction

14

and therefore could have created a fiduciary relationship.

The next question the Court must resolve is which parties had a fiduciary relationship with Barefield. As the Court mentioned, a party must show these factors to establish a fiduciary relationship between parties in a commercial transaction: "(1) the parties have shared goals in each other's commercial activities, (2) one of the parties places justifiable confidence or trust in the other party's fidelity, and (3) the trusted party exercises effective control over the other party." *AmSouth v. Gupta*, 838 So. 2d 205, 216 (Miss. 2002).

The Court finds sufficient evidence to create a genuine issue as to the existence of a fiduciary relationship between Barefield, Lionshead, Doki, Janumpally, and Valleru as to the escrow agreement. As to the first element, Barefield, Miller's, Lionshead each sought to profit from each other's commercial activity (Barefield as the subcontractor, Miller's as the contractor, Lionshead as Miller's money manager). Although Defendants argue this was a mere arm's-length transaction, there is sufficient evidence to suggest Doki induced Barefield's reliance with a promise to hold the funds in escrow. This element is therefore satisfied. *See Saucier v. People's Bank of Biloxi*, 150 So. 3d 719, 725-26 (Miss. Ct. App. 2014). As to the second element, the Court finds there is a genuine issue as to whether Barefield justifiably relied on Lionshead's fidelity as Miller's money manager. Barefield states it became concerned about payment for the BLM project when it learned Miller's had new owners (Janumpally and Valleru) who had no experience in the industry. [199] at 2. Based on this concern, Maczka contacted Paul Olsen, the

former Miller's CEO and individual with whom Maczka had first discussed the BLM

project. In response, Olsen set up a conference call with Doki, who Olsen called the

"new owner's representative," and Maczka, during Doki allegedly promised to hold

the BLM funds in escrow to assuage Maczka's concerns. These facts are enough to

create a genuine issue as to whether Barefield justifiably relied on Lionshead to

hold the funds in escrow for Miller's. Finally, as to the third element, Lionshead and

Miller's exercised control over Barefield in withholding the BLM funds. For these

reasons, the Court denies summary judgment as to Lionshead.

Summary judgment also is denied as to Doki, Valleru, and Janumpally. As

this Court discussed, an officer, director, *or agent* of a corporation can be held

individually liable for the commission, or authorization, of a tort, even if he or she

acts on behalf of the corporation. *See* Section III(A)(1) (emphasis added); *see also*

*Union Nat'l Life Ins. Co. v. Crosby*, 870 So. 2d 1175, 1180 (Miss. 2004) (explicitly

stating that breach of fiduciary duty is a tort). The Court need not pierce the

corporate veil to find these individuals liable. Although Doki was not an officer or

director of Lionshead or Miller's, there is a genuine issue as to whether he acted as

Miller's agent under the Services Agreement between Miller's and Lionshead. The

record shows that Janumpally and Valleru delegated nearly all the management

responsibly for Miller's to Lionshead, including the payment of its subcontractors.

Even if he were not an agent, however, he may still be liable. *See Knox Glass Bottle*

*Co. v. Underwood*, 89 So. 2d 799, 824 (Miss. 1956) (holding that "one who

participates with a fiduciary in a breach of his duties, with knowledge that he is

violating his obligations, is liable for the profits received thereby from the corporation"); Restatement (Second) of Torts § 874, cmt. c ("A person who knowingly assists a fiduciary in committing a breach of trust is himself guilty of tortious conduct and is subject to liability for the harm thereby caused."), § 876 ("For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself . . .").

And Valleru and Janumpally were officers and directors of Miller's, and as such, may be personally liable for Miller's breach of its fiduciary duty to Barefield. Although Defendants claim no facts support a finding that Valleru and Janumpally were involved in Doki's transfer of the BLM funds to Lionshead's account, this Court disagrees. Olsen's affidavit states, "Over my strenuous objection, on November 29, 2016, Janumpally and Valleru, through Lionshead and Doki, swept the $320,000 received from the federal government[,] which was payment under the contract with Barefield, from Miller's bank account[,] transferring the funds to Lionshead." [199-5], ¶ 7. Doki's November 29, 2016 email states, "I just spoke to the owners. *They want to hold the money* until we speak with Haworth and then to their attorneys and decide the path of least litigation." [199-6] (emphasis added). Viewed in the light most favorable to Barefield, the Court finds sufficient evidence supports that fiduciary relationship exists between Barefield and Lionshead, Doki, Janumpally, and Valleru.

17

b.  Insolvency

Barefield also alleges Defendants had a fiduciary duty to pay Miller's creditors rather than engage in self-dealing transactions because Miller's was insolvent. Defendants allege Barefield cannot prove insolvency as a matter of law, and even if it could, this duty would apply only to Janumpally and Valleru. Barefield disagrees and insists it had a fiduciary relationship with Doki and Lionshead as a result of the Services Agreement between Miller's and Lionshead.

Parties agree a corporate officer's duty of care and loyalty shifts to the corporation's creditors in "circumstances amounting to a 'winding-up' or dissolution of the corporation." [196] at 15; [199] at 10.[4] This Court has held that the Court should consider these five factors when determining whether a corporation is "winding up":

> (1) whether the corporation was insolvent, or nearly insolvent, on a balance sheet basis; (2) whether the corporation was cash flow insolvent; (3) whether the corporation was making plans to cease doing business; (4) whether the corporation was liquidating its assets with a view of going out of business; and (5) whether the corporation was still prosecuting its business in good faith, with a reasonable prospect and expectation of doing so.

*Koch Foods, Inc. v. Pate Dawson Co.*, 2017 WL 4818426, at *5 (S.D. Miss. Oct. 25, 2017). The Court must therefore decide whether Barefield submits sufficient evidence to create a genuine issue as to each of these elements.

Barefield presents sufficient evidence to show that Miller's was "winding up" when it transferred the BLM funds to Lionsheads account to use for other expenses.

---

[4] Parties do not dispute that North Carolina law, Miller's place of incorporation, apply here.

As to the first and second elements, there is sufficient evidence showing that Miller's was insolvent on balance sheet and cash flow bases. Janumpally testified she learned Miller's was not "financially viable" after only a few months; Doki testified Lionshead never received money from Miller's because Miller's could not pay; and Boyapati testified Miller's often needed "loans" from Lionshead because it did not have the money to pay its subcontractors. As to the third, fourth, and fifth elements, Paul Olsen attested that Miller's largely stopped operating after the transfer of the $320,000 and dissolved shortly after this. Olsen also states Miller's entered into a high interest factoring agreement to pay off a low interest credit line at a local South Carolina bank, even though the company was defaulting on payments to vendors and using its funds to pay for expenses in unrelated businesses. The Court finds these facts are enough to create a genuine issue as to whether Miller's was "winding up" when it decided to use the BLM funds for other expenses.

Defendants ask the Court to grant summary judgment as to Doki and Lionshead because the fiduciary duty of corporate officials to creditors only applies to officers and directors. *Koch Foods, Inc.*, 2017 WL 4818426, at *5. Barefield contends that this duty extends to Doki and Lionshead under the Services Agreement between Miller's and Lionshead. Unlike its conversion and fraud claims, Barefield does not argue that Doki and Lionshead can be liable for assisting Valleru and Janumpally in their alleged breach of corporate fiduciary duties to Miller's. As such, the Court must grant summary judgment as to Doki and Lionshead. The

Court denies summary judgment as to Valleru and Janumpally, though, finding
there is a genuine issue as to whether Miller's was winding up and whether they
breached their duty to Barefield.

    2.  Fraud

    Barefield argues Defendants committed fraud when Barefield reasonably
relied on Doki's promise to hold the BLM funds in escrow to complete the BLM
project because Doki, acting as the agent for Valleru and Janumpally in his capacity
as a Lionshead employee, knew he would not hold the funds in escrow. Defendants
respond that a promise to perform an act cannot state a claim for fraud and that
there is no evidence Doki acted on behalf of Valleru and Janumpally. Barefield
contends fraud applies to promises to perform future acts when the promisor does
not intend to perform the promise when he makes it.

    In Mississippi, a plaintiff needs to establish, by clear and convincing
evidence, these elements to prove fraud:

> (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's
> knowledge of its falsity or ignorant of its truth; (5) his intent that it
> should be acted on by the person in a manner reasonably contemplated;
> (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its
> truth; (8) the hearer's right to rely thereon; and (9) his consequent and
> proximate injury.

*Trim v. Trim*, 33 So. 3d 471, 478 (Miss. 2010). Fraud "cannot be based on future
promises, 'except in some cases when a contractual promise is made with the
present undisclosed intent not to perform.'" *Holland v. Peoples Bank & Trust Co.*, 3
So. 3d 94, 100 (Miss. 2008). As fraud is a tort, Valleru, Janumpally, and Doki, may
be liable for the torts of Miller's and Lionshead if they "participated in," "authorized

or directed," "acted in [their] own behalf," "had any knowledge of," or has "given any consent to" the tortious act, or if they "acquiesced in it when [they] either knew or by the exercise of reasonable care should have known of it and should have objected and taken steps to prevent it." *Turner*, 620 So. 2d at 548-49.

Barefield presents sufficient evidence to show that each party may be liable for fraud. First, Defendants admit, "there was no agreement or intent that any funds be held in escrow," Answer, [135], ¶ 29. Doki states in his testimony that he does not recall any promise to place the BLM funds in escrow and did not intend to do so without a written escrow agreement. Additionally, both Maczka and Olsen state Doki promised to hold the BLM funds in escrow, Doki did not do so, and Barefield relied on the truth of this promise (and ignorance of its falsity) to purchase and install the furniture in the BLM building. Barefield also submits evidence showing Doki made this promise in response to its concerns about Miller's new ownership and highlights that it reasonably relied on Miller's representative because this transaction was subject to strict rules and requirements as a government contract. The Court finds these facts create a genuine issue as to whether each element of fraud is met. For these reasons, the Court denies summary judgment as to all parties on this claim.

IV.    Conclusion

The Court has considered all the arguments that parties set forth. Those arguments not addressed would not have changed the outcome of the Court's decision. For these reasons, the Court grants in part, denies in part, Defendants'

Motion for Summary Judgment [195] and finds as follows:

- Conversion: denied as to all Defendants

- Unjust Enrichment: denied as to all Defendants

- Civil Conspiracy: granted as to Janumpally, Valleru, and Doki; denied as to Lionshead

- Breach of duty (escrow): denied as to all Defendants

- Breach of duty (insolvency): granted as to Doki and Lionshead; denied as to Valleru and Janumpally

- Fraud: denied as to all Defendants

SO ORDERED AND ADJUDGED this the 25th day of August, 2021.

s/ *Kristi H. Johnson*
UNITED STATES DISTRICT JUDGE